UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
RIVKA REICHMANN,

                        Plaintiff,          **MEMORANDUM AND ORDER**
       -against-                             CV 16-5151 (AYS)

WHIRLPOOL CORPORATION and
KITCHENAID, INC.,

                        Defendants.
------------------------------------------------------------X

**SHIELDS, Magistrate Judge:**

This is a personal injury case commenced by Plaintiff, Rivka Reichmann ("Plaintiff" or "Reichmann"), against Defendants, Whirlpool Corporation and KitchenAid, Inc. (collectively "Whirlpool").[1] Plaintiff is a consumer who purchased and used Whirlpool's refrigerator-freezer (the "Appliance"). She claims injury following her fall on a puddle of water caused by a defect in the Appliance. Presently before the Court is Defendant's motion for summary judgment. See Docket Entry herein ("DE") [39]. For the reasons set forth below, the motion is denied.

BACKGROUND

I.     Basis of Facts Recited Herein

In support of their motion, Defendants have properly filed a statement of facts in accord with Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 56.1"). Plaintiff has also properly filed her Rule 56.1 Statement. The facts set forth below are drawn from the parties' statements. Unless otherwise indicated, the facts are agreed upon.

---

[1]     Plaintiff names both Whirlpool and KitchenAid as Defendants. As discussed herein, Whirlpool is the manufacturer of the product at issue that appears to have been sold under the KitchenAid name. The Court refers to Defendants together as "Whirlpool."

1

II.  Factual Background

   A.  Whirlpool and the Product at Issue

Whirlpool designs and manufactures home appliances, including combination refrigerator-freezers. Defendants' Rule 56.1 Statement (DE [48]) at ¶ 1.[2] Whirlpool sells its refrigerator-freezers, such as the Appliance, to trade customers who then sell them to consumers. Id. at ¶ 2.

   B.  Operation of the Freezer Compartment in the Appliance

The freezer compartment of the Appliance is positioned below the refrigerator portion. Id. That freezer is a "no-frost" freezer, which automatically defrosts so that a consumer does not need to periodically unplug the freezer to get rid of built-up frost. Id. at ¶ 8. In no-frost freezers, melted frost, called "condensate" is drained outside of the freezer compartment, typically through a tube or funnel at the bottom of the freezer compartment. Id. at ¶ 10.

   C.  Issues Surrounding the Use of Duckbill Valves

In or around 2010, Whirlpool began using "duckbill-style" valves as part of a drain system to help drain condensate from the freezer compartment in certain bottom-mount combination refrigerator-freezers. After receiving consumer complaints of excess frost buildup, Whirlpool added duckbill valves to the drain process to limit the amount of airflow from the refrigerator-freezer's machine compartment (i.e., where the mechanical components of the unit are located) into the freezer compartment, thereby reducing frost accumulation in the freezer compartment. Id. at ¶ 11. The Appliance was one of the Whirlpool bottom-mount refrigerator-freezers that utilized a duckbill valve. Id. at ¶ 12.

---

[2]  Where there is agreement as to facts, the Court cites only to Defendants' Rule 56.1 Statement and not to Plaintiff's Statement or documents underlying statements such as deposition testimony.

By 2011, Whirlpool became aware that due to the short length of the duckbill valves, water passing through those valves would occasionally freeze, which would clog the drain valve. That clogging would reduce the ability of condensate to drain from the freezer compartment, and could allow a layer of ice to form at the bottom of the freezer compartment. If that layer of ice was allowed to grow, the condensate water could then exit the bottom of the refrigerator and leak onto the floor underneath and around the refrigerator. Id. at ¶ 13.[3] Plaintiff takes issue with Defendants' characterization of where the water leaking from a freezer would go. It is obvious that such water would first leak underneath the refrigerator (as Defendants' state) and eventually to the area of the floor surrounding the refrigerator (as Plaintiff states).

To prevent water from freezing in the short duckbill valves originally used, in or around 2011, Whirlpool began using longer duckbill valves in its bottom-mount refrigerator freezers. Id. at ¶ 14. In or around 2012, Whirlpool began to notice that some of the long duckbill valves were also causing drainage problems, which also resulted in leaking. Id. at ¶ 15. Thereafter, Whirlpool investigated potential solutions for the clogged duckbill valves. Id. at ¶ 18.

Ultimately, Whirlpool implemented the use of "p trap" valves instead of duckbill valves. Id. Whirlpool also implemented a p-trap service solution for consumers who had refrigerator-freezers with duckbill valves. In August and November of 2013, Whirlpool issued "Technical Service Pointers" (which are communications from Whirlpool to technicians regarding the proper way to diagnose and repair products in the field) on the subject of clogged duckbills. Technical Service Pointers issued in August and November 2013 instructed service technicians

---

[3] Plaintiff states that Whirlpool knew of the issue with duckbill valves since 2009. As the full opinion herein makes clear, the parties' quarrel as to particular dates is not an issue of material fact with respect to the Court's summary judgment analysis.

to replace duckbill valves with p-trap valves. Id. at ¶ 20-21. Whirlpool fielded thousands of service calls arising from clogged duckbill valves. Id. at ¶ 23.

      D.      <u>Claims Arising out of Clogged Duckbill Valves</u>

Whirlpool has produced a list of claims and lawsuits brought prior to Plaintiff's July 10, 2015 injury with allegations of leaking water from all refrigerator-freezers with duckbill valves. The list contains 532 matters. Of these matters, all were for property damage. None were for personal injury, and prior to Plaintiff's claim there were no slip and fall claims made to Whirlpool as a result of water exiting a refrigerator as a result of a clogged duckbill. Id. at ¶ 24.

Plaintiff takes issue with Defendants' characterization of prior lawsuits. It is Plaintiff's position that Whirlpool has, indeed, been sued for personal injuries caused by leaks from refrigerators. In support of this allegation, Plaintiff refers to the case of <u>Deeds v. Whirlpool</u>, S.D. Texas, No. H:15-cv-2208. Id. at ¶ 41. Plaintiff also states that Whirlpool's representation regarding lawsuits refers only to those commenced prior to Plaintiff's lawsuit, and that it has not produced documents regarding actions filed after Plaintiff's lawsuit. Id. Plaintiff further states that Whirlpool's records document a concern of slip and fall injury caused by clogged duckbills. Id. at ¶ 42.

      E.      <u>Plaintiff's Purchase of the Appliance and the Leak</u>

On or about March 2, 2013, Plaintiff purchased the Appliance from one of Whirlpool's trade customers. Id. at ¶ 3; 25. The Appliance was a bottom-mount combination refrigerator-freezer, sold under the KitchenAid name, bearing model number KFCS22EVMS8. Id. at ¶ 4. The Appliance was likely produced in late December 2012 or early January 2013, and utilized a long duckbill valve as part of its freezer drain system. Id. at ¶ 26.

Plaintiff knew that there was water leaking from the bottom of the Appliance. Id. at ¶ 27. She observed a puddle of water on her kitchen floor prior to scheduling the Appliance for repair on July 10, 2015. Id. at ¶ 28. Plaintiff's husband, Thomas Reichmann ("Thomas"), testified that he noticed the Appliance leaking anywhere from one to three months before July 10, 2015, the initial date scheduled for service of the Appliance. Id. at ¶ 30. Thomas discussed the leak with his brother, who owned the same model refrigerator-freezer as the Reichmanns, and who had experienced the same leaking issue. As a result of the conversation with his brother, Thomas became aware that the water on his kitchen floor was the result of a problem with the Appliance, and not spilled water from another source. Id. at ¶ 31. When Thomas noticed water leaking, he wiped it up with a towel. Id. at ¶ 32. To increase the time between leaks, Thomas would also remove the sheet of ice he observed in the bottom of the Appliance's freezer. Id. at ¶ 33.

In or about the last week of July 2015, Thomas called Whirlpool about the leak and was provided with the telephone number of a repair person. Id. at ¶ 34. The repair person was scheduled to fix the Appliance on July 10, 2015. Id. at ¶ 35.

F.  Plaintiff's Injury

On July 10, 2015, Plaintiff was cooking in her kitchen when the scheduled repair person knocked on her door. Id. at ¶ 36. Plaintiff has a sunken kitchen. The Appliance was situated next to the oven, which is next to the step up and out of the kitchen into the dining room, and towards the front door. Id. at ¶ 37. Upon hearing the knock on her door, Plaintiff ran through the kitchen to answer the door. She states that she stepped in a puddle of water in front of the Appliance. Id. at ¶ 38. Plaintiff was barefoot at the time. She states that when her bare foot hit the wet floor, she slipped. She suffered injury when she fell forward and hit her chin on the steps leading into the dining room. Id. at ¶ 39.

5

III. The Complaint

Plaintiff commenced this action on September 16, 2016. She alleges essentially the facts set forth above with respect to the events regarding her purchase of the Appliance and her fall. See generally DE [1]. The complaint sets forth two causes of action; the first, for common law negligence, and the second, for strict product liability. As to the latter, Plaintiff claims that Defendants' are strictly liable for the design, manufacture and sale of a product that is unreasonably safe. In particular, it is alleged that the Appliance creates an unreasonably hazardous condition, in that it is "prone to create a puddle of water on the floor in front of the freezer," and that Defendants' unsafe product caused Plaintiff to suffer damages for which Defendants are liable.

IV. Defendants' Motion

As noted, Defendants move for summary judgment. They argue that Plaintiff's claims fail as a matter of law because she cannot show that the Appliance presented a substantial risk of harm, and therefore that the product was unreasonably dangerous so as to trigger liability under New York law. Whirlpool also argues that Plaintiff's claims are subject to dismissal because the facts show that she had actual notice of the Appliance's defect.

In response, Plaintiff argues that the risk of fall presented by the leaking Appliance renders the product unsafe within the meaning of New York law, and that prior consumer complaints establish that the product is unsafe. As to Plaintiff's knowledge of the leak prior to her fall, she argues that such knowledge does not preclude her claim but, at most, goes to the issue of contributory fault that might, if proven at trial, only reduce damages.

Having outlined the facts and the parties' positions, the Court turns to the merits of the motion.

DISCUSSION

I.      <u>Legal Principles: Standards on Summary Judgment</u>

Summary judgment is appropriately granted only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted). "A fact is material if it 'might affect the outcome of the suit under the governing law[.]'" <u>Baldwin v. EMI Feist Catalog, Inc.</u>, 805 F.3d 18, 25 (2d Cir. 2015) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 242, 248 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the Court must "construe the evidence in the light most favorable to the non-moving party," <u>Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay</u>, 868 F.3d 104, 109 (2d Cir. 2017) (quotations, alterations and citation omitted). Thus, the Court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment." <u>Davis-Garett v. Urban Outfitters, Inc.</u>, 921 F.3d 30, 45 (2d Cir. 2019) (quotations and citation omitted).

"A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" <u>Pollard v. New York Methodist Hosp.</u>, 861 F.3d 374, 378 (2d Cir. 2017) (quoting <u>Anderson</u>, 477 U.S. at 248). The burden of showing an

7

absence of genuine dispute as to a material fact lies with the moving party. CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." Lyons v. Lancer Ins. Co., 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted).

"'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" Fabrikant v. French, 691 F.3d 193, 205 (2d Cir. 2012) (quoting Anderson, 477 U.S. at 252); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." DiStiso v. Cook, 691 F.3d 226, 230 (2d Cir. 2012); see also Federal Trade Comm'n v. Moses, 913 F.3d 297, 305 (2d Cir. 2019) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment."); Flores v. United States, 885 F.3d 119, 122 (2d Cir. 2018) ("While we are required to resolve all ambiguities and draw all permissible factual inferences in favor of the non-moving party, ... conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment[.]") (quotations, alterations and citations omitted).

II. Law Applicable to Plaintiff's Claims

The basis for the exercise of Federal jurisdiction in this matter is diversity of citizenship. Accordingly, the law of the State of New York applies to Plaintiff's claims. Bank of N.Y. v. Amoco Oil Co., 35 F.3d 643, 650 (2d Cir. 1994). As noted above, Plaintiff's complaint alleges two causes of action: strict product liability and negligence. Her strict product liability claim alleges design defect, and her negligence claim alleges that Defendant acted unreasonably in designing the Appliance.

8

Where, as here, a plaintiff alleges strict product liability under a design defect theory, she must show that: (1) the product is "defective" because it is not reasonably safe as marketed; (2) the product was used for a normal purpose; (3) the defect was a substantial factor in causing the plaintiff's injuries; (4) the plaintiff by the exercise of reasonable care would not have both discovered the defect and apprehended its danger; (5) the plaintiff would not have otherwise avoided the injury by the exercise of ordinary care. Mustafa v. Halkin Tool, Ltd., No. 00-CV-4851, 2007 WL 959704, at *10 (E.D.N.Y. Mar. 29, 2007) (citations omitted); see also Acquisto v. Manitowoc Co., Inc., 273 F. Supp.3d 343, 347 (N.D.N.Y. 2017) ("In New York, 'to establish a prima facie case in strict products liability for design defects, the plaintiff must show that the manufacturer breached its duty to market safe products when it marketed a product designed so that it was not reasonably safe and that the defective design was a substantial factor in causing plaintiff's injury.'") (citing Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 107, 463 N.Y.S.2d 398, 450 N.E.2d 204, 208 (1983)).

A product is unreasonably unsafe "if, assuming the defect [was] known at the time of manufacture, 'a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner.'" Acquisto, 273 F. Supp. 3d at 347 (quoting, Voss, 59 N.Y.2d at 108) (alteration in original). Courts consider "seven non-exclusive factors" when determining the risk of harm against utility and cost. Voss, 59 N.Y.2d at 109. Those factors are:

- the utility of the product to the public as a whole and to the individual user;
- the nature of the product – that is, the likelihood that it will cause injury;
- the availability of a safer design;

9

- the potential for designing and manufacturing the product so that it is safer but remains functional and reasonably priced;

- the ability of the plaintiff to have avoided injury by careful use of the product;

- the degree of awareness of the potential danger of the product which reasonably can be attributed to the plaintiff; and

- the manufacturer's ability to spread any cost related to improving the safety of the design.

Voss, 59 N.Y.2d at 109. Courts often consider the issues of substantial risk of harm along with feasibility of designing a safer product together in considering the overall questions of risk versus utility. Rupolo v. Oshkosh Truck Corp., 749 F. Supp.2d 31, 42 (E.D.N.Y. 2010). Additionally, when considering feasibility and the availability of an alternative design, it is appropriate to consider post-manufacturing changes made by a manufacturer. Id. Importantly, the question of whether a product's risk of harm outweighs its utility is generally a fact-based question for a jury to decide. Acquisto, 273 F. Supp. 3d at 348.

As to the negligence claim alleged, under a design defect theory, the focus shifts from the characteristics of the product itself to the conduct of the manufacturer; "plaintiff must additionally prove that the manufacturer could have foreseen the injury and, therefore, acted unreasonably in designing the product." Mustafa, 2007 WL 959704, at *10. Accordingly, Plaintiff's negligence claim requires that she prove that Defendant "acted unreasonably in designing the product." See Erazo v. SCM Grp. N. Am., No. 16-CV-2386, 2019 WL 1044365, at *19 (E.D.N.Y. Mar. 5, 2019) (quoting Voss, 59 N.Y.2d at 107) (distinguishing claim of negligence from claim of strict liability based upon design defect). Where, as here, a plaintiff alleges a design defect, whether that claim arises under a product liability or negligence theory,

she must prove that "it was feasible to design the product in a safer manner." Erazo, 2019 WL 1044365, at *20. The claims of product liability and negligence differ in terms of proving proximate cause. In the product liability scenario, proximate cause must exist "between the design defect of the product and the injury – that is, the plaintiff must show that the design defect in the product was a substantial factor in causing his injury." Id.

While design defect claims for strict product liability are distinguishable from those based in negligence, it has been held that for purposes of establishing a prima facie case in the summary judgment context, the claims are "functionally equivalent." Berusashvili v. Hobart Corp., No. 05-CV-1646, 2010 WL 11622750, at *9 (E.D.N.Y. July 15, 2010); see also Erazo, 2019 WL 1044365, at *20. Accordingly, in the summary judgment context, the claims are often analyzed together. Rupolo, 749 F. Supp. 2d at 43 n.4.

III. Disposition of the Motion

At the outset, the Court considers the facts surrounding Plaintiff's knowledge of the puddling condition around the Appliance, and the fact that she knew that this condition originated in the Appliance. While these facts are admitted, they do not, as discussed below, require dismissal of Plaintiff's Complaint.

Contrary to Defendants' position, Plaintiff's knowledge that there was a puddle on the floor in front of the Appliance (on which she slipped) does not require a grant of summary judgment as to her claims of negligence or product liability based upon design defect. Instead, that knowledge goes only to the issues of risk, proximate cause and contributory fault. See Orlick v. Granit Hotel & Country Club, 30 N.Y.2d 246, 249-50, 331 N.Y.S.2d 651 (1972); Dolinar v. Health, 155 A.D.3d 1576, 63 N.Y.S.3d 632 (4th Dep't. 2017) (stating that plaintiff's knowledge of condition of floor goes only to "the issue of plaintiff's comparative negligence"); Voss, 59

11

N.Y.2d at 109 (noting that the ability of the plaintiff to have avoided injury by careful use of the product is a factor regarding risk/utility analysis). Thus, Plaintiff's conduct on the day of her injury is a factor to be considered by the jury at trial, and not a fact dispositive to Defendants' summary judgment motion.

Nor is Plaintiff's Complaint subject to dismissal on the ground that no person had ever made a claim for personal injury after slipping on a puddle created by the Appliance. This fact, if proven, might be probative of the issue of whether Defendants' knew of the allegedly defective condition. However, that is hardly an issue here, where Defendants had full knowledge of the problems associated with use of the duckbill valve. Moreover, to the extent argued, this Court rejects the notion that the alleged defect was "too trivial" to be actionable. Sulinski v. Ardco, Inc., 298 A.D.2d 992, 992, 747 N.Y.S.2d 674 (4th Dep't. 2002).

The Court also rejects the notion argued by Defendants that the Appliance, as manufactured, did not present an unreasonable risk of harm as a matter of law. As noted, the issue of risk of harm is generally a question of fact to be decided by a jury. Plaintiff here has clearly presented a triable issue of fact as to risk of harm and her claims are therefore not subject to dismissal on summary judgment.

As a final matter, the Court addresses any claim that might be alleged on a failure to warn theory. While it is not clear whether Plaintiff alleges such a theory (and it does not appear that she does) no such claim survives summary judgment. This is because Plaintiff's knowledge of the puddling condition around her refrigerator negates a product liability claim based upon a failure to warn. Francis v. 107-145 W. 135th St. Assoc., Ltd., Partnership, 70 A.D.3d 599, 600, 895 N.Y.S.2d 400 (1st Dep't 2010) (finding that an open and obvious danger negates duty to warn); Berusashvili, 2010 WL 11622750, at *12 (finding it appropriate to dismiss failure to warn

claim "as a matter of law if: (1) the defendant had no duty to warn because the hazard was patently dangerous or posed an open and obvious risk; or (2) the plaintiff cannot prove causation because 'the injured party was fully aware of the hazard through general knowledge, observation or common sense, or participated in the removal of a safety device whose purpose is obvious.'") (citation omitted). This holding likely has no effect here because Plaintiff's strict liability claim appears to allege only design defect. See DE [1]. Still, to the extent that any product liability claim is based upon a failure to warn, that claim is dismissed.

In sum, considering the facts set forth above, when construed (as required) in the light most favorable to Plaintiff, triable issues of fact exist requiring a denial of Defendants' motion for summary judgment.

## CONCLUSION

Defendants' motion for summary judgment, appearing at Docket Entry No. [39] herein, is denied. The Court hereby schedules trial of this matter to proceed with jury selection and trial on April 16, 2020.

**SO ORDERED.**

Dated: Central Islip, New York
January 14, 2020

/s/ Anne Y. Shields
Anne Y. Shields
United States Magistrate Judge